IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 1:11cr489 (JCC) |
| MICHAEL MAKALOU, ) | |
| ) | |
| Defendant. ) | |

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Michael Makalou's (1) Motion to Dismiss; (2) Motion to Suppress Search; and (3) Motion to Suppress Statements.  For the following reasons, the Court will deny Defendant's motions.

### **I. Background**

    A.    <u>Factual Background</u>

On September 1, 2011, a Complaint was filed alleging that Defendant had violated 18 U.S.C. § 113(a)(3).  [Dkt. 1] That statute states: "(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows: . . . (3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by a fine under this title or imprisonment for not more than ten years, or both."  18 U.S.C. § 113(a)(3) (2011).

The affidavit attached to the Complaint alleges that Defendant assaulted his spouse (A.C.M.) on or about August 13, 2011, in their United States diplomatic residence in Dakar, Senegal. (Shawn Conrad Aff. [Dkt. 2] ¶¶ 1-2.) It states that Defendant's spouse reported that Defendant slapped her, choked her, stomped on her, beat her with his fists, knocked her unconscious, spat on her, smeared nasal mucous on her face, and threatened to kill her. (*Id.* ¶¶ 7, 9-14.) It also states that Defendant "picked up a plastic dollhouse, about two feet in length, and slammed it down upon A.C.M.'s head while A.C.M. lay on the ground." (*Id.* ¶ 11.) Finally, the affidavit states that the victim reported that the assaults continued throughout the morning and early afternoon until around 4:30 p.m. (*Id.* ¶ 15.)

On August 13, 2011, Sarah Devlin, a friend of the Makalou family, contacted the Resident Security Officer in Dakar and requested that an agent respond to her home.[1] (Government Opposition to Defendant's Motion to Suppress Evidence [Dkt. 52] (Gov't Evid. Opp.) at 1.) Shortly thereafter, Special Agent Kerry Osterhout arrived at Devlin's residence. (*Id.*) Devlin reported to K. Osterhout that A.C.M. and her two young daughters were in her home, and that A.C.M. told her that Makalou had assaulted her throughout the day. (*Id.*) Devlin informed K.

---

[1] These facts are supported by the testimony of the Government's witnesses at the suppression hearing: Special Agents Thad Osterhout, Nicholas Hicks, and Shawn Conrad. The Court found the testimony provided by the Government's witnesses credible.

Osterhout that A.C.M.'s nine-year-old son remained with Makalou at the Makalou residence. (*Id.*)

After K. Osterhout reported the incident, Special Agents William Alfano and Nicholas Hicks and the Post's Medical Officer arrived at Devlin's home. (Gov't Evid. Opp. at 4.) Shortly thereafter, Alfano, Hicks, and Special Agent Thad Osterhout went to the Makalou residence to conduct a welfare check, to retrieve passports and clothes belonging to A.C.M. and the children, and to take custody of Makalou's son and transport him to Devlin's residence. (Gov't Evid. Opp. at 4-5.)

T. Osterhout explained to Makalou that the agents were there to conduct a welfare check in response to the incident reported by his wife. (Gov't Evid. Opp. at 5.) T. Osterhout advised Makalou that the Ambassador had directed Makalou to provide the passports of A.C.M. and his children. (*Id.*) Makalou was also asked to provide a change of clothes for his wife and family. (*Id.*) The agents did not conduct a search of the house nor did they seize evidence. (*Id.*) The agents also did not ask Makalou to make any statements. (Government Opposition to Defendants' Motion to Suppress Statements [Dkt. 53] (Gov't Statements Opp.) at 5.)

Makalou, however, wanted to tell the agents his side of the story. (*Id.*) T. Osterhout advised Makalou that he did not have to make any statements, but that the agents were

willing to listen to him. (Gov't Statements Opp. at 6.) While T. Osterhout transported Makalou's son to Devlin's home, Alfano and Hicks sat with Makalou in his living room and listened to his version of the events. (*Id*.) The agents asked occasional questions when Makalou said something they felt needed clarification. (*Id*.) The agents left Makalou's home without taking Makalou into custody. (Gov't Statements Opp. at 7.)

The following day, Special Agents Alfano and Hicks returned to the Makalou residence to photograph Makalou's injuries. (Gov't Statements Opp. at 7-8.) The agents provided Makalou with a *Kalkines* warning, which read:

> You are being asked to provide information as part of an investigation being conducted by the Department of State. This is a voluntary interview. Accordingly, you do not have to answer questions. No disciplinary action will be taken against you solely for refusing to answer questions. Any statement you furnish may be used as evidence in any future criminal proceeding or agency disciplinary proceeding, or both.

(*See* Gov't Statements Opp. Ex. A.) Makalou signed the *Kalkines* warning and then submitted a written statement. (*See* Gov't Statements Opp. Ex. B.)

Within days of the alleged assault, Makalou and his family were medically evacuated to the Washington, D.C. area. (Gov't Statements Opp. at 8.) Makalou arrived in the United States on August 15, 2011, and his family arrived the following day. (*Id.*)

4

On September 1, 2011 -- the same day that the Complaint was issued against Makalou -- Special Agent Shawn Conrad contacted Makalou to inquire whether he was willing to meet for a voluntary interview. (Gov't Statements Opp. at 9.) Makalou responded in the affirmative, and asked whether he should bring an attorney. (*Id*.) Conrad answered that he could not give that type of advice. (*Id*.)

The following morning, Makalou met with Conrad and Special Agent John Stemen at the offices of the Diplomatic Security Service's Professional Responsibility Division in Arlington, Virginia. (*Id*.) Makalou was escorted to an interview room. (*Id*.) Before questioning took place, Conrad advised Makalou that he was free to leave and did not have to answer questions. (*Id*.) The agents also provided Makalou with a DS-7619 form, titled "Warning and Assurance to Employee Requested to Provide Information on a Voluntary Basis," which reflected that the inquiry related to the "incident on 8/13/11 in Dakar." (*Id*; Gov't Statements Opp. Ex. C.) Makalou read the form and signed the section under the heading, "Waiver." (Gov't Statements Opp. at 9-10, Ex. C.) Conrad asked Makalou to explain in his own words the incident involving his wife. (Gov't Statements Opp. at 10.) Shortly after the interview started, another agent knocked on the door and interrupted the interview. (*Id*.) Conrad stepped outside and spoke with the

agent. (*Id*.) When Conrad returned to the room, Stemen advised Makalou of his *Miranda* rights. (*Id*.) Makalou indicated that he understood his rights and agreed to answer questions. (*Id*.) At the conclusion of the interview, Makalou was placed under arrest. (Gov't Statements Opp. at 11.)

In or about the first week of September 2011, Conrad asked A.C.M. for permission to enter the Makalou residence in Dakar and take custody of the dollhouse that Makalou had reportedly used to strike her on the head. (Gov't Evid. Opp. at 6.) A.C.M. gave agents permission to enter her home. (*Id*.) On September 12, 2011, agents entered the Makalou residence and took possession of the dollhouse. (*Id*.)

B. Procedural Background

On November 8, 2011, Defendant filed a Motion to Suppress Search [Dkt. 42], Motion to Suppress Statements [Dkt. 44], and Motion to Dismiss [Dkt. 48]. The Government filed oppositions on November 15, 2011. [Dkts. 52, 53, 55.] Defendant's motions are now before the Court.

**II. Analysis**

A. Motion to Dismiss

Defendant makes two general arguments in favor of the Motion to Dismiss: first that a dollhouse is not a "dangerous weapon" under 18 U.S.C. § 113(a)(3) and second, in the alternative, that 18 U.S.C. § 113(a)(3) is unconstitutionally

6

vague and the rule of lenity applies. The Court will consider each in turn.

### 1. Dangerous Weapon

Defendant claims that the indictment is insufficient because a dollhouse is not a "dangerous weapon." (Def's Mot. to Dismiss [Dkt. 48] ¶ 3.) In support Defendant makes two arguments: first that it is "patently obvious" that a dollhouse is not a dangerous weapon and second that because Title 8 does not define the term "dangerous weapon," the definition in 40 U.S.C. § 5104(a)(2) should govern the term's meaning. (Def's Memorandum in Support of Motion to Dismiss [Dkt. 49] (Def's Dismiss Mem.) at 1-2.)

Turning first to the definition in 40 U.S.C. § 5104(a)(2), Title 40 is a collection of statutes that regulates public buildings and works, and thus its connection to Title 8, an assault statute, is less than apparent. More problematically, 40 U.S.C. § 5104(a) states that its definition of "dangerous weapon" refers to the use of the phrase "[i]n this section," and therefore it is limited to that section. As a result, the Court finds that Defendant has provided no reason to apply the definition of "dangerous weapon" in Title 40.

The Court turns next to the case law discussing Title 18 and the term "dangerous weapon." Supreme Court and Fourth Circuit precedent is instructive on what should or should not be

obvious about the use of the phrase "dangerous weapon" in this case. "The Supreme Court has eschewed a mechanical test of dangerousness in favor of a multi-factored inquiry which emphasizes the capacity of the instrument to instill fear or to inflict harm." *United States v. Sturgis*, 48 F.3d 784, 787 (4th Cir. 1995) (citing *McLaughlin v. United States*, 476 U.S. 16, 17-18 (1986)). "[W]hat constitutes a dangerous weapon depends not on the object's intrinsic character but on its capacity, given 'the manner of its use,' to endanger life or inflict serious physical harm." *Sturgis*, 48 F.3d at 787 (*quoting United States v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963)). Thus, "an object need not be inherently dangerous to be a dangerous weapon." *Id.* "Rather, innocuous objects or instruments may become capable of inflicting serious injury when put to assaultive use." *Id.* (collecting cases showing that a belt and shoe, metal and plastic chair, tennis shoe, stapler, a telephone receiver, and body parts have been found to be dangerous weapons).

Furthermore, the "determination of whether a given instrumentality was used as a 'dangerous weapon' must be left to the jury." *Id.* at 788. The Fourth Circuit has stated:

> The test of whether a particular object was used as a dangerous weapon is not so mechanical that it can be readily reduced to a question of law. Rather, it must be left to the jury to determine whether, under the circumstances of each case, the defendant

8

> used some instrumentality, object, or (in some instances) a part of his body to cause death or serious injury. This test clearly invites a functional inquiry into the use of the instrument rather than a metaphysical reflection on its nature.

*Id.* Thus, the Court concludes that it is possible that a dollhouse constitutes a dangerous weapon under 18 U.S.C. § 113(a)(3). The Court also notes that there is evidence indicating Defendant allegedly used his body parts in committing the assault, which might also be considered dangerous weapons. *See id.*

### 2. Vagueness

Defendant argues that the statute is unconstitutionally vague and that by allowing the definition of "dangerous weapon" to include anything that may be used in a dangerous manner impermissibly expands the language used in the statute. (Def's Dismiss Mem. at 4.) The Court rejects these arguments.

First, Defendant's void-for-vagueness argument must be considered an "as applied" challenge, as "[f]acial vagueness challenges to criminal statutes are allowed only when the statute implicates First Amendment rights." *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (citing *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002)); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is

not . . . expressive conduct protected by the First Amendment.").

As applied to Defendant, the Court finds that 18 U.S.C. § 113(a)(3) is not unconstitutionally vague. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Tracy*, No. 10-46762011, U.S. App. LEXIS 23853, at *11 (4th Cir. Nov. 30, 2011) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The Supreme Court has stated that "the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid." *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 342 (1952); *see also Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) (noting that the "Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."). Moreover, the Fourth Circuit has explained that "[r]equiring the proof of specific intent satisfies the first element of the void for vagueness test, in that the convicted must have had notice that the conduct is

proscribed in order to have the specific intent required for the money laundering crime." *United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir. 1992), and that "[t]he intent requirement alone tends to defeat any vagueness challenge based on the potential for arbitrary enforcement." *Klecker*, 348 F.3d at 71.

Here, the statute requires "intent to do bodily harm" and the indictment alleges that Defendant "knowingly" committed an assault. Defendant's alleged assault as described above was prolonged and involved. Any ordinary person would know that such conduct is prohibited. The Court finds that the language of 18 U.S.C. § 113(a)(3) is not unconstitutionally vague as to prevent fair notice and that it does not encourage arbitrary enforcement.

### 3. Rule of Lenity

Finally, Defendant argues that ambiguity in the phrase "dangerous weapon" is sufficient to invoke the rule of lenity. (Def's Dismiss Mem. 2-3.) The rule of lenity "leads [courts] to favor a more lenient interpretation of a criminal statute 'when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)).

To review, 18 U.S.C. § 113(a)(3) states: "(a) Whoever, within the special maritime and territorial jurisdiction of the

United States, is guilty of an assault shall be punished as follows: . . . (3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by a fine under this title or imprisonment for not more than ten years, or both." The Court begins by looking to the language of the statute and giving the "words used" their "ordinary meaning." *Richards v. United States,* 369 U.S. 1, 9 (1962). The Black's Law Dictionary defines "dangerous weapon" as "an object or device that, because of the way it is used, is capable of causing serious bodily injury." Black's Law Dictionary 1624 (8th ed. 2004). It also defines "weapon" as "an instrument used or designed to be used to injure or kill someone" and "dangerous" as "perilous; hazardous; unsafe." *Id.* at 421, 1624. The Fourth Circuit has interpreted "dangerous weapon" to mean "some instrumentality, object, or (in some instances) a part of [the] body" that has the "capacity, given the manner of its use, to endanger life or inflict serious physical harm." *Sturgis*, 48 F.3d at 787-88 (internal quotations omitted). This interpretation is consistent with the common understanding of those words, is clear, and is unambiguous. For these reasons, the Court finds that 18 U.S.C. § 113(a)(3) unambiguously prohibits the conduct alleged here.[2]

---

[2] Moreover, to the extent the statute is ambiguous, that ambiguity is not sufficiently grievous to warrant the rule of lenity. *See Dolan v. United States*, 130 S. Ct. 2533, 2544 (2010) ("[A]fter considering the statute's text, structure, and purpose, we nonetheless cannot find a statutory

B. Motion to Suppress Search

Makalou also moves to suppress "all evidence tangible and intangible" obtained from his residence on August 13, 2011. He argues that the agents who came to his home were conducting a criminal investigation, and that the evidence they obtained must be suppressed because it was the product of an unreasonable, warrantless search.[3] As the Government points out, however, no evidence was seized from Makalou's residence on August 13, 2011. And, to the extent Makalou objects to the taking of his family's passports and clothes, such an objection is moot given the Government's indication that it has no intention of introducing these items into evidence.

At the suppression hearing, Makalou also argued that the dollhouse, which was procured from Makalou's residence on September 12, 2011, should be suppressed. A.C.M., however, authorized agents to enter the house and retrieve the dollhouse. It is well established that a search conducted pursuant to valid consent is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

---

ambiguity sufficiently 'grievous' to warrant [the rule of lenity's] application in this case.").

[3] At the suppression hearing, Makalou's counsel also attempted to portray this incident as a search, which led to the *subsequent* procurement of evidence. This characterization, however, is contradicted by the testimony given by T. Osterhout. According to T. Osterhout, agents were only present in the entry room, stairway, and upstairs landing of Makalou's residence, and did not see any evidence. T. Osterhout further testified that it was Makalou who retrieved the passports and clothes, which he then handed over to the agents. Hicks and Alfano only stayed at Makalou's request, and sat in his living room as Makalou recounted his version of the events.

(1973). Here, A.C.M. had actual authority to consent to a search of the home she shared with Makalou and their children in Dakar. *See United States v. Matlock*, 415 U.S. 164, 170 (1974) (noting that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared"). For these reasons, the dollhouse is admissible, and Makalou's Motion to Suppress Search is denied.

    C.   <u>Motion to Suppress Statements</u>

Finally, Makalou moves to suppress all "all evidence tangible and intangible obtained as a result of any statement defendant may have made." (Def's Mot. to Suppress Statements [Dkt. 44] at 1.) Makalou made statements to agents at his home on August 13, 2011, he provided a written statement on August 14, 2011, and he made statements prior to his arrest on September 2, 2011.

"A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by *Miranda*." *United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995) (citations omitted). Any statements a suspect makes during custodial interrogation are inadmissible unless the defendant received *Miranda* warnings. *Id.; see also Berkemer v. McCarty*, 468 U.S. 420, 434 (1984). A person is "in custody" for *Miranda* purposes when he is formally arrested or questioned under

circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." *Leshuk*, 65 F.3d at 1108 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, *Stansbury*, 511 U.S. at 322, and determine whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Interrogation, in turn, refers not only to express questioning, but also to any "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

With respect to the statements made on August 13, 2011, Makalou states that given his position as a political affairs officer, he was required to comply with all security requests made of him by the State Department. (Def's Memorandum in Support of Motion to Suppress Statements [Dkt. 45] (Def's Statements Mem.) at 1.) Makalou also asserts that diplomatic security agents are entitled to enter residences without warrants for security purposes, and had informed him on August 13, 2011, that they were at his residence for such purposes and that his cooperation was required. (*Id.*) Makalou proceeds to

15

argue that for these reasons, he was not free to leave (Def's Mot. to Suppress Statements ¶ 8) and, given the absence of *Miranda* warnings, his statements made on that date should be suppressed (*see id.* ¶ 11).

The Government responds that Special Agent T. Osterhout requested Makalou's cooperation with regard to producing passports. (Gov't Statements Opp. at 13.) The agents did not request Makalou's cooperation in any other respects, nor did they require him to answer questions. (*Id.*) When Makalou told the agents he wanted to relay his version of the events, T. Osterhout advised him that he did not have to make any statements. (*Id.*) Nevertheless, Makalou proceeded to tell his side of the story. This account was supported by T. Osterhout's testimony at the suppression hearing.

The Court finds that on August 13, 2011, Makalou was neither in custody nor subject to interrogation, and hence his statements made that day are admissible. The statements at issue were made in Makalou's home, and the agents never attempted to restrain Makalou's movements or actions. These circumstances do not amount to "custody." *See United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001)(*Miranda* warnings not required where defendant was questioned in her own home and not handcuffed or otherwise restrained, and was never told she was not free to leave). Nor does the Court find that there was an interrogation.

Indeed, it was Makalou who insisted on telling the agents his side of the story.  T. Osterhout testified that he repeatedly tried to stop Makalou from making statements, and clarified that he and the other agents were at his home for security purposes only.  Hicks and Alfano eventually agreed to speak with Makalou.  Their occasional follow-up questions to Makalou's voluntary statements likewise did not rise to the level of "interrogation."  As a number of courts have concluded, *Miranda* concerns are not implicated in this type of situation.  *See, e.g.*, *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir.1985) (holding that no interrogation occurred where, in response to suspect's volunteered statement, "You can't take that," police inquired, "why," and suspect replied, "I can't run my business without that").

Makalou's written statement given on August 14, 2011, is likewise admissible.  Again, Makalou provided this statement at his home and was neither handcuffed nor restrained.  The *Kalkines* warning made clear that Makalou was not required to give a statement, that no disciplinary action would be taken against him should he refuse to provide a statement, and that any statement furnished could be used against him in criminal proceedings.  Given these circumstances, a reasonable person would not conclude that he or she was in custody or being subject to interrogation.

Lastly, the Court finds that the statements made by Makalou prior to his arrest on September 2, 2011, are admissible. First, the Court finds that Makalou was not in "custody." Special Agent Conrad called Makalou and asked him whether he was willing to meet for a voluntary interview. Before any questioning took place, Special Agent Conrad advised Makalou that he did not have to answer questions and was free to leave. The DS-7619 Form signed by Makalou further confirmed that the interview was voluntary and that Makalou was free to terminate the encounter.

That Conrad subjectively intended to arrest Makalou at the end of the interview does not change the result. Rather, the determination of custody depends "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 425 U.S. at 346; *see also Berkemer*, 468 U.S. at 442 (an officer's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time"). Based on the circumstances, the Court concludes that a reasonable person in Makalou's position would not have believed he or she was in custody.

In any event, it appears that Makalou did not provide any substantive information concerning the alleged assault until

18

after he was in fact *Mirandized*.[4]  Indeed, the Government stated at the suppression hearing that it does not intend to introduce any statements made by Makalou before he was read his *Miranda* rights.  Accordingly, Makalou's Motion to Suppress Statements is denied.

### III.  Conclusion

For the reasons stated above, the Court will deny Defendant's Motion to Dismiss, deny Defendant's Motion to Suppress Search, and deny Defendant's Motion to Suppress Statements.

An appropriate Order will issue.


|  | /s/ |
|---|---|
| December 12, 2011 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |

---

[4] Though not raised by the parties, the Court notes that this is not at all a situation where officers deliberately gave *Miranda* warnings mid-interrogation, after incriminating statements were made, and provoked the defendant to repeat the incriminating statements after being *Mirandized*.  *See Missouri v. Seibert*, 542 U.S. 600, 604 (2004) (plurality opinion) (holding that post-warning statements in such a scenario are inadmissible).  At the suppression hearing, Conrad testified that Makalou had uttered only a few sentences before being *Mirandized*.  In sum, it appears that *Miranda* warnings were read in this case not as a deceptive technique but rather out of an abundance of caution.

19